# FRANS LAHTI v. DULUTH, MISSABE & NORTHERN RAILWAY COMPANY.
## FRANS LAHTI v. JAMES C. DAVIS, AGENT.[1]

December 14, 1923.

Nos. 23,571, 23,572.

**Surface and permanent waters.**

1. The charge correctly stated the distinction between surface and permanent waters and the law applicable to the drainage of each.

**Permanent waters in big swamp.**

2. It was not error to charge that there were permanent waters in a swamp which the plaintiff claimed was so drained as to flood his farm.

**Separation of damages from permanent waters and from surface waters.**

3. The court correctly instructed the jury as to the right of recovery for damage done by permanent waters, and the effect upon their verdict, if it was found that the damage claimed was done partly by permanent waters and partly by surface waters.

**Finding of damage from permanent waters sustained.**

4. The evidence justifies a finding that permanent waters from the swamp flooded and damaged plaintiff's farm.

**Damages not excessive.**

5. The defendants were not entitled to a new trial upon the ground that the damages were excessive.

**Denial of new trial correct.**

6. The court did not err in denying the defendant's motion for a new trial upon the ground of newly discovered evidence.

[1]Reported in 196 N. W. 470.

Two actions in the district court for St. Louis county to recover $3,343.70 and $836, respectively. The cases were tried together before Fesler, J., who when plaintiff rested denied defendants' motion to dismiss and at the close of the testimony denied their motion for directed verdicts, and a jury which returned verdicts for $781.25 and $806.75, respectively. From an order denying their motions for judgment notwithstanding the verdict or for a new trial, defendants appealed. Affirmed.

*Frank D. Adams, Elmer F. Blu* and *Dennis F. Donovan,* for appellants.

*W. H. Gurnee* and *W. F. Dacey,* for respondent.

DIBELL, J.

Two actions tried together, one against the Duluth, Missabe & Northern Railway Company, the other against James C. Davis, Agent designated by the President under the Transportation Act, to recover damages for the flooding of the farm of the plaintiff. In each case there was a verdict for the plaintiff. The defendants appeal from the alternative order denying their motion for judgment or a new trial.

The plaintiff is the owner of the SW¼ of the NW¼ of 4-54-20, in St. Louis county. Sand creek, a branch of the St. Louis river, runs through it. Alborn is a station on the main line of the defendant railway some 35 miles northwest of Duluth. From this point the main line runs north to the iron country. Another line, known as the Alborn or Coleraine branch, extends northwesterly from Alborn to Coleraine in Itasca county. At a point on this branch, called Hull Junction, some 25 or 30 miles northwest of Alborn, a branch known as the Hull-Rust branch, carrying ore traffic only, goes north to the Hibbing mining district. Sand creek is northerly and easterly of these branches. Both branches are in swamp. The nearest corner of the plaintiff's farm is a little more than a half mile easterly or northeasterly of the Coleraine branch and a mile and a half or so southeasterly of Hull Junction.

The railway company constructed ditches designated in the evidence as numbers 1, 2, 3, 4, 5, 6 and 8 from its roadbed so as to outlet

in Sand creek. Ditches 1, 2, 3 and 4 pass from the railroad ditch and outlet below plaintiff's land. Number 5 outlets in his farm. Numbers 6 and 8 outlet above it. Through the roadbed are culverts connecting with the ditches. These carry the waters collecting in the ditch on the southwesterly side of the Alborn branch. At Hull Junction, something like a mile and a half to the northwest of the plaintiff's farm, is a large swamp. It is tapped by Ditches 8 and 6. There is evidence that it contains 25 or 30 thousand acres; that water is in it the year round; that it is in some places 5 feet to the sand bottom, and in other places 20 feet; and that in some places it is waist deep. It is described by some as an open swamp. There are in it islands which have a solid bottom, and there is floating bog. Water stands in the swamp southwest of the Alborn branch. The creek is the general route of natural drainage.

1. The court correctly defined to the jury the difference between surface waters and permanent waters and correctly stated the law applicable to the drainage of each. The charge closely followed Hartle v. Neighbauer, 142 Minn. 483, 172 N. W. 498, and other cases there cited, and Krupke v. Stockard, 103 Minn. 349, 115 N. W. 175, and is in harmony with our cases decided since. The occasion does not call for a restatement of the law or a review of the cases. They are accessible. Dunnell, Minn. Dig. and Supp. § 10165, et seq.

2. The court charged that there were permanent waters in the big swamp at Hull Junction. Under the evidence there were. Such was the effect of the testimony of the witnesses on both sides who pretended to knowledge. The character of the swamp we have described.

3. The court charged that only to such waters of the swamp as were permanent in character could they apply the law applicable to the drainage of permanent waters, and correctly instructed it as to the separation of damages accruing from permanent waters and properly drained surface waters. The charge was not in this respect unfavorable to the defendants. Over and over again the jury was told that only in event that permanent waters did the damage to the plaintiff's land, or some damage to it, could there be a recovery for the drainage of permanent waters, and that damage done

by surface waters properly drained, the rules for the proper drainage being rightly stated, must be eliminated from a verdict.

4. The evidence sustains the finding that permanent waters from the swamp reached the plaintiff's farm and definitely contributed to its flooding. This does not mean that a verdict for the defendants would not be sustained. It may be that the waters coming through the low ditches, especially 1, 2, 3 and 4, were not permanent waters. We do not say so. There is evidence that waters stood in these ditches all the year. The swamp to the west, from which waters were collected by the railroad, was a big one, and waters stood in it and on its surface. There was no effort by the defendants to eliminate the lower ditches from consideration, nor was their importance at all emphasized by the court. If anything it was minimized. Ditches 8 and 6, especially 8, were the ones that apparently did the greater damage. The effect of 5 was probably not negligible.

5. It is claimed that the damages are so excessive as to indicate passion and prejudice. Perhaps they are large. We cannot hold that they are excessive within the rule which permits our interference. They are within the evidence. The jury may not have given full credence to the witnesses testifying as to value, or it may have made deductions because it believed that some of the damage was done by properly drained surface waters. The determination of the amount was for the jury subject to the supervision of the trial court.

6. One ground of the motion for a new trial is newly discovered evidence. That now offered as newly discovered tends to show that prior to the construction of the ditches Sand creek in times of heavy rains overflowed. From such evidence it would be urged that surface waters and not permanent waters drawn from the swamp did the damage. Whether a new trial should have been granted on this ground was for the trial court and the record does not indicate that it unwisely exercised its discretion.

There are a large number of assignments, 29 in all, some of them involving several separate points. We have examined each of them. Some relate to the admission or exclusion of evidence. Some relate to the charge, or some detached portion of it. We find no error in the admission of evidence calling for consideration, and no errors in

the charge which need be discussed. It seems to us that there was a complete and clear presentation of the evidence, with no unfairness to the defendants either in the statement of the law or in the reference to the facts. The evidently candid claims of the defendants in this respect have been carefully considered, but we do not find substantial basis for them.

Order affirmed.

QUINN, J. (dissenting.)

I dissent. The region traversed by the Coleraine and Hibbing branches of the defendant's system of railway, is one vast swamp some 25 miles in extent. It is composed of tamarack, cedar, spruce, moss and muskeg marshes, all different. Sand Creek furnishes the nearest natural drainage outlet for that part of the swamp near Toivola and Hull Junction. This region was heavily timbered, and in early days loggers cut and removed the timber, and in times of high water, drove the logs down the creek to the St. Louis. At certain times during the summer seasons the water in this portion of the swamp dried up so that the bottom of the creek was dry and a person might walk across that portion of the swamp, but, following heavy rains or the melting of snow, it was covered with water.

The fall of the surface of the ground on the bottom of the depressions or coolies where the seven ditches were constructed, and the locality where they reached the creek are as follows: No. 1 has a fall of over 15 feet and reaches the creek 3 miles below the plaintiff's forty; No. 2 and No. 3 have a fall of over 6 feet and their waters reach the creek about 2 miles below the forty; No. 4 has a fall of about 6 feet and reaches the creek immediately below the forty; No. 5 has a fall of nearly 7 feet and its waters enter the creek on the forty; No. 6 has a fall of about 5 feet and enters the creek about 160 rods west of the forty; No. 8 extends east from a point 160 rods west of the Hull Junction depot, has a fall of over 10 feet, and terminates at the place where No. 6 empties. These grades have reference to the surface of the swales and not to the bottom of the ditches. Under these circumstances, it seems clear that these ditches, with the exception of No. 8, only help to accelerate the flow of surface waters and that the defendant company was within its

legal rights in ridding its right of way of such waters in the manner in which it did.

About 2 miles north of Hull Junction is a deep, spongy formation over a mile in width from north to south, and several miles in length from east to west. This formation is created, as the proofs indicate, by the growth of new moss on top of the old. As the new moss dies it forms another layer which adds to the height of the formation. In this way the formation is gradually built up so that the very deepest and wettest part of the entire swamp may attain a higher altitude than any other part of the wet territory. This formation is an absorbent of water through which very little percolates. Such was the condition on either side of the Hibbing Branch. This formation constitutes what is referred to as the Divide. This divide embraces many deep holes or moss-hags which are full of water. To drain or lower the water in these moss-hags along its right of way, the defendant cut a ditch from within the divide south along the west side of its roadbed to Ditch No. 8 which allowed water to flow south and then east toward Sand Creek.

The plaintiff concedes that the borrow pits referred to do not collect enough water to keep the ditches running during the dry seasons. He claims that permanent waters from the swamp get into the ditches from the swales through which they extend, and swell the volume of water in the creek. This contention is not tenable. While it may be conceded that a landowner has no right to collect surface water into an artificial channel or precipitate it in greatly increased quantities upon his neighbor, to the substantial injury of the latter, yet this is not what the plaintiff complains of. His contention is that, if the company wishes to rid its right of way of surface water, it should have done so by means of short ditches in such a manner as to allow the water to spread out and soak into the swamp land so that a portion thereof might evaporate and the other portion saturate the swamp and finally flow gently into the creek or natural outlet. The creek was the natural drainage outlet for that region. The swales extended from near the right of way increasing in depth as they neared the creek, and constituted natural feeders to that stream. The ditches extended from borrow pits on the right of way

and were about four feet deep near their sources, decreasing in depth until they reached the termini, where they were of no substantial depth. If the waters from the right of way, turned loose upon the swamp, would partly evaporate and partly find their way along these natural depressions under the surface of the ground, we are unable to understand how these ditches could acquire what we may term permanent water from the bottom of these natural runways.

The water from the divide west of the Hibbing Branch presents a much different proposition. It was very largely confined in the moss-hags. The character of these waters as well as the amount thereof, if any, which reached the plaintiff's forty, was clearly for the jury under proper instructions.

I am of the opinion that appellants were entitled to have the jury instructed in effect that the waters from the first 6 ditches mentioned, should not be considered in determining the amount of damages which plaintiff was entitled to recover. At the request of plaintiff the court instructed the jury as follows:

"The laws of this state provide means of establishing drainage ditches so as to drain swamps and marshes such as plaintiff claims existed near Hull Junction and no one has a right to drain a swamp or other permanent body of water onto the land of another or into a natural drain or watercourse so as to flood and injure the land of another."

For this reason I think a new trial should be granted.